UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

M.S. and D.S., individually    :
and on behalf of M.S., Jr.,    :
                               :    HONORABLE JOSEPH E. IRENAS
           Plaintiffs,         :    CIVIL ACTION NO. 06-533
                               :
    v.                         :         **OPINION**
                               :
MULLICA TOWNSHIP BOARD         :
OF EDUCATION,                  :
                               :
           Defendant.          :

**APPEARANCES:**

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
By:  Rebecca K. Spar, Esq.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602
          Counsel for Plaintiffs

PARKER MCCAY, P.A.
By:  Paul C. Kalac, Esq.
1009 Lenox Drive, Suite 102A
Building 4 East
Lawrenceville, New Jersey 08648
          Counsel for Defendant

**IRENAS**, Senior District Judge:

    Plaintiffs, M.S. and D.S., individually and on behalf of

their minor son, M.S., Jr., bring this Individuals with

Disabilities Education Act ("IDEA") suit, 20 U.S.C. §§ 1400-1491,

against the Mullica Township Board of Education (the "Board of

Education" or "School Board").  Plaintiffs assert that Defendant

failed to provide M.S., Jr. with a free and appropriate public

education.  They seek tuition reimbursement for their unilateral

placement of M.S., Jr. in private school for the 2004-2005 school

year, as well as reimbursement for additional private occupational therapy sessions and independent evaluations performed on M.S., Jr.  Defendant asserts a counterclaim, appealing the Administrative Law Judge's ("ALJ") decision that Plaintiffs were entitled to reimbursement of costs associated with certain independent evaluations of M.S., Jr.

Plaintiffs move for summary judgment.  Defendant cross-moves for judgment on the administrative record.[1]

## I.

M.S., Jr. was born on February 24, 1999, eight and one half weeks premature, due to complications with his mother's pregnancy.  He spent the first five weeks of his life in the hospital, during which time he suffered end-lung disease, heart failure, and a brain hemorrhage.  These events, and the health challenges M.S., Jr. faced after leaving the hospital,[2] resulted in developmental delays in his gross and fine motor skills, speech-language development, and sensory integration.

Plaintiffs became involved with Defendant Mullica Township Board of Education in the first months of 2002, when a Child Study Team ("CST") evaluated M.S., Jr.  He was three years old at

---

[1]  The Court has subject matter jurisdiction pursuant to 20 U.S.C. § 1415(i).

[2]  Among other things, M.S., Jr. had surgery on both of his eyes at the age of 21 months.

the time.  Because the CST determined that he was Preschool Disabled,[3] an Individualized Education Program ("IEP") was created for M.S., Jr., pursuant to which he was enrolled in the Board's mainstream preschool.[4]  He received early intervention services, including occupational therapy, speech therapy, and physical therapy.  Most relevant to the present dispute, the IEP provided that M.S., Jr. was to receive 30 minutes of occupational therapy once a week.  (Administrative Record ("A.R.") at R-2, p. 9)

Approximately one year after M.S., Jr.'s preschool enrollment, the CST reconvened for an Annual Review IEP conference.  D.S. attended the conference.  The Annual IEP Review Report, dated February 21, 2003, states,

> [M.S., Jr.] has demonstrated wonderful progress thus far in [the Occupational and Speech Therapy] program. [He] is participating well with the other children and is even attempting to help other students with things they find difficult. [He] is communicating well, using appropriate sentence length utterances to describe things, answering and asking questions and participating in simple conversations.  Although he has improved greatly,

---

[3]  "'Preschool child with a disability' corresponds to preschool handicapped and means a child between the ages of three and five experiencing developmental delay, as measured by appropriate diagnostic instruments and procedures in one or more [of the following areas] . . . i. Physical, including gross motor, fine motor and sensory (vision and hearing); ii. Cognitive; iii. Communication; iv. Social and emotional; and v. Adaptive." N.J.A.C. 6A:14-3.5(c)10; *see also* 20 U.S.C. § 1401(3)(B)(definition of "child with a disability" for a child aged 3 through 9).

[4]  The mainstream preschool included disabled and non-disabled students. A special education teacher and a teacher's aide assisted with the disabled students.  M.S. Jr.'s IEP provided that he would be included with "general education students" for 80% or more of the school day.

> it is still felt that he would benefit from
> continued Occupational and Speech Therapy to
> maintain his skills and introduce new skills as he
> matures.

(A.R. at R-4)  The Report provided that during the next year,

M.S., Jr. would receive occupational therapy once a week for 30

minutes.  (Id.)  D.S. signed the IEP Review Report indicating

with a check-mark in the appropriate box that, "I (We) the

parents of [M.S., Jr.] agree to the recommendation of program

[sic] and related services described in this Individualized

Education Program." (Id.)[5]

Despite the CST's conclusions regarding M.S. Jr.'s progress

in occupational therapy, in September, 2003, D.S. sought an

independent evaluation of M.S., Jr., by Leigh Ann Bliss, an

occupational therapist at Voorhees Pediatric Hospital.  The

report generated from the evaluation observes that M.S., Jr.

exhibited "moderate to severe impairment" in fine motor skills

and sensory processing and "moderate impairment" in postural

mechanisms, visual perception, and "activities of daily living."

(A.R. at P-6)  The report further explained,

> [M.S., Jr.] is having difficulties in the areas of
> auditory processing, vestibular (movement)

---

[5]  D.S.'s signature is dated March 31, 2003, and includes a handwritten note that she "agree[s] to revised IEP sent 3-26-03."  (A.R. at R-4) The record is not clear whether R-4 is the revised IEP or the original.  Moreover, there is no documentary or testimonial evidence about how the original IEP differed from the revised IEP.  However, the revisions do not appear to be material to the parties' present dispute, as neither side addresses this issue.

processing, touch processing, multi-sensory
processing, and modulation of sensory input as
related to emotional responses and activity level.
[He] also demonstrates some challenges with his
behavioral responses to sensory input, including
emotional and social responses. [He] also
demonstrates overall postural weakness, especially
in his upper extremities and trunk.  It was very
difficult for him to assume and sustain anti-
gravity postures.  Overall, [M.S., Jr.] is
demonstrating challenges in all developmental
areas and it therefore negatively impacts his
abilities to independently perform age appropriate
daily tasks such as ADL's, play skills and school
activities.

(A.R. at P-6)  Ms. Bliss recommended occupational therapy once a

week for 60 minutes to improve "fine motor, visual motor/visual

perceptual, motor coordination and sensory processing/sensory

modulation skills."  (Id.)  The long term goals of the

occupational therapy included,

> (1) "mature grasp pattern of writing utensil 100% of
> the time";
>
> (2) "fasten/unfastening of buttons, snaps and
> zippers 90% of the time";
>
> (3) "complete unfamiliar motor actions with only one
> additional verbal cue after initial instruction";
>
> (4) "demonstrate age appropriate postural strength
> as needed to participate in gross motor games such
> as animal walks, and sitting upright in a chair for
> extended periods of time";
>
> (5) "demonstrate an appropriate response to sensory
> input in the areas of touch, vestibular and auditory
> input";
>
> (6) "complete tasks of visual motor/visual
> perceptual skills (i.e. puzzles,
> construction/building games, and writing) with
> minimal assistance"; and

> (7) "Family will demonstrate carryover of
> recommended home activities 100% of the time."

(Id.)

In a letter D.S. sent to the CST on September 26, 2003, D.S.
reports that based on the results of Ms. Bliss' evaluation,
"[M.S., Jr. appears to have weakness and rapid fatigue in his
hands and upper body.  He continues to have difficulty with fine
motor skills, posture, and auditory processing.  It seems that he
needs more frequent occupational therapy than is available on
site at the school."  (A.R. at R-6)  D.S. inquired "whether the
child study team could cover the expense of this additional
occupational therapy."  (Id.)

Loretta Becker, a social worker and member of the CST, spoke
to D.S. about the letter on October 1, 2003.  They scheduled a
meeting for October 17, 2003, "to discuss [D.S.'s] concerns."
(A.R. at R-6)  Ms. Becker spoke to D.S. again the following day.
Ms. Becker's notes in the "Parent/Guardian Contact Log"
(maintained in M.S., Jr.'s file) state,

> [D.S.] voiced concern re: Vor. Pediatric Hospital
> O.T. statements that [M.S., Jr.] has auditory
> processing problems and needs additional O.T.
> services . . . further discussions are warranted at
> 10/17 meeting.

(A.R. at R-6)  A formal letter to M.S., Jr.'s parents followed,
indicating that a Program Review was scheduled for October 17,
2003, in order "to review the progress your child has made,
discuss your concerns as noted in the letter you submitted to the

Child Study Team on September 30, 2003, and to review whether or
not the program and placement currently being provided are still
appropriate for your child's needs."  (A.R. at R-7)

The Program Review was held on October 17, 2003.  The
"Reevaluation Evaluation Plan" that resulted from the meeting
states,

> The Mullica Township Child Study Team has reviewed
> and considered the Occupational Therapy Evaluation
> report from Voorhees Pediatric Hospital, however,
> [M.S., Jr.] is not demonstrating those delays in his
> academic environment with the exception of weak
> grasp pattern on writing utensil.  He is beginning
> to do this with verbal cues.  The goals recommended
> by the Occupational Therapist from Voorhees
> Pediatric Hospital are the same as the goals the
> school based Occupational Therapist is focusing on.
> The Mullica Township Child Study Team discussed in
> length with [D.S.] [M.S. Jr.'s] achievements and
> progress thus far.  Due to the discrepancy between
> [M.S. Jr.'s] behavior and functional abilities at
> home, the report from Voorhees Pediatric Hospital,
> and his behavior and functional abilities at school,
> the Mullica Township Child Study Team has suggested
> a re-evaluation to be completed at school to assess
> his academic status, occupational and speech skills
> at this time. . . . [D.S.] has not agreed to this
> re-evaluation at this time. [She] is requesting
> Occupational Therapy at Voorhees Pediatric Hospital
> instead of the school based Occupational Therapist
> as she feels more comfortable with them.  As stated
> above, the school based Occupational Therapy is
> presently working on the same goals that were
> suggested by Voorhees Pediatric Hospital.  She would
> also like auditory processing therapy, however, he
> is not demonstrating difficulties in this area
> during school.

(A.R. at R-5)  D.S. signed the reevaluation report, acknowledging
that she received and reviewed it, but attached a one-page, typed

letter outlining the reasons why she disagreed with the CST's

conclusions:

> [I] sent a letter to the Child Study Team on
> September 26, 2003 requesting that [M.S., Jr.'s]
> current occupational therapy services be extended to
> an outside provider, and requesting a copy of [M.S.,
> Jr.'s] CST records in order to finish his
> application for funding/benefits through DDD. [I]
> did not request this meeting, which was planned and
> arranged by Ms. Loretta Becker. [I] asked why there
> would be a meeting and Ms. Becker stated, "To
> discuss your concerns."  All [I] wanted was
> administrative approval for extension of current
> services to an outside provider.
>
> . . . [M.S., Jr.'s] activities at school have not
> completely reflected what is in his IEP. [I]
> indicated at the October meeting how [M.S., Jr.'s]
> developmental issues are too multiple and
> complicated to be handled by the school, and that we
> need to obtain more specialized help from the
> outside. [M.S., Jr.'s] motor skills had not improved
> after 19 months of therapy at the school, but they
> began to improve after one month of therapy at
> Voorhees.  The Child Study Team staff kept insisting
> that [M.S., Jr.] is developmentally normal and does
> not qualify for special education services anymore.
> A social worker, Ms. Heins, arranged to have [me]
> come to the school for counseling to accept that
> [M.S., Jr.] is 'normal,' despite the recent report
> from Voorhees Pediatric Rehabilitation Hospital
> indicating that my son is moderately to severely
> impaired in at least 5 developmental areas.
> Although [M.S., Jr.] has improved in expressive
> language during the past year, he still has multiple
> serious developmental impairments which affect his
> ability to learn and function at school.  The Child
> Study Team denied all of the developmental findings
> of the outside evaluation, and would not consider
> any of its contents.  The goals in the evaluation at
> Voorhees are different from the ones at school.  The
> recommendation from Voorhees is for OT services once
> per week for 60 minutes but no duration has yet been
> determined.
>
> The Child Study Team also repeatedly and adamantly

> refuted that [M.S., Jr.] has sensory integration
> disorder.  Ms. Grob[6] and Ms. Becker also made
> repeated accusations that [M.S., Jr.] is not
> performing at home because of his 'home
> environment.'  The Child Study Team dismissed any
> input and observations stated by [me]. . . . The
> school so far will only recommend what they have
> available 'at the school' for [M.S., Jr.], instead
> of recommending what he actually needs.

(A.R. at R-5)

M.S., Jr. had already begun private occupational therapy

once a week when the reevaluation meeting took place.  (A.R. at

P-48)

On October 24, 2003, D.S. wrote to the Superintendent of the

school district advising him that M.S., Jr. was "moderately to

severely impaired in 5 developmental categories" and required

services from Voorhees Pediatric Rehabilitation Services.  (A.R.

at R-9)  She stated that M.S., Jr. required occupational therapy

twice weekly using equipment "not available at the school or

home."  (Id.)  She continued,

> I am now requesting that my son no longer be treated
> by the school's current contracted Occupational
> Therapist, Sandra Grob.  This therapist has not only
> been ineffective, but she has also caused harmful
> effects on my child's development.
>
> I am requesting that the Child Study Team and the
> Hilda Frame School staff no longer discuss or
> consult with the school's occupational therapist
> regarding my son's development or activities.  Any
> questions should be forwarded to my son's

---

[6] Sandra Grob was M.S., Jr.'s occupational therapist and a member of
the CST.

> Occupational Therapist (Lee Ann Bliss) at Voorhees
> Rehabilitation Services.
>
> I am also requesting that the staff at the Hilda
> Frame School <u>not</u> do any brushing or sponge brushing
> activities with my child.  This therapy has been
> taught and used with improper technique, which has
> sent scrambled messages to my son's brain.  I am
> also requesting that is the school staff uses a
> compression vest, that it never be applied for more
> than 15-20 minutes.

(A.R. at R-9)

The principal of M.S. Jr.'s school responded to D.S. on
October 27, 2003, advising her that the CST had created a
reevaluation plan to guide the CST in their determination whether
M.S., Jr. required "additional or different Occupational Therapy
Services."  (A.R. at R-11)  He further advised that the school
would honor her request that Ms. Grob stop providing occupational
therapy to M.S., Jr. but stated that the school would still
consult with Ms. Grob regarding M.S., Jr.'s needs. (Id.)  Lastly,
the principal indicated that the school would honor D.S.'s other
requests regarding her son's treatment. (Id.)

After D.S. requested that M.S., Jr. stop occupational
therapy at school, he began twice weekly private occupational
therapy, which continued until May 26, 2005. (A.R. at P-48)

The CST held the Reevaluation Classification meeting on

March 12, 2004.[7]  The stated purpose of the meeting was to
"determine [M.S., Jr.'s] academic and school based therapy needs
at this time" in light of the discrepancies between Ms. Bliss's
evaluation and the observations of the school's therapy
providers.  (A.R. at R-20)  The CST reviewed evaluations from
M.S., Jr.'s Speech-Language Therapist, Ms. Sullivan-Pittman and
his Occupational Therapist, Ms. Grob.

     Ms. Grob's evaluation reported the results of three motor
skills tests, revealing below-average performance on grasping
patterns and eye-hand coordination.[8] (A.R. at R-20)  Ms. Grob
concluded,

>      [M.S., Jr.'s] skills tend to scatter with the area
> of most difficulty being with his immature grasping
> patterns.  Sensory motor skills have greatly
> improved though [he] continues to be impulsive and
> sometimes [is] distracted by his environment.  It is
> recommended that [M.S., Jr.] continue to receive
> occupational therapy services, one time a week, for
> 30-minute sessions.  Focus of intervention will be
> to improve sensory motor processing skills for all
> school related activities.

(A.R. at R-20)

     A new IEP (the "March 2004 IEP") was created based upon the
information reviewed by the CST at the Reevaluation
Classification Meeting.  The IEP stated that the "measurable

---

[7]  The meeting was postponed twice before finally convening.  D.S. and
the CST Chairperson, Loretta Becker, corresponded several times about D.S.'s
concerns during the intervening months.

[8]  Test results were average to above average for M.S., Jr.'s auditory-
visual motor and gross motor skills. (A.R. at R-20)

annual goals" for M.S., Jr. were to "[i]mprove sensory

[fine/gross] motor skills for all school related activities" and

"[t]o maintain age appropriate communication skills."  (A.R. at

R-21)  The Recommended Program was Integrated Preschool with

daily language arts, learning stations, and gross motor activity.

(Id.)  The IEP also provided for occupational therapy once a week

for 30 minutes.  (Id.)[9]

> On May 13, 2004, D.S. wrote to the CST stating,
>
> We feel strongly that the school district has failed
> to provide our son, [M.S., Jr.] with a free and
> appropriate public education.  As a result, he has
> failed to progress.  Even worse, he has regressed in
> some areas.
>
> At this point, we are convinced that the
> district is unable to meet [M.S., Jr.'s] needs and
> that he must be placed in an out-of-district school
> where he can receive an appropriate education.  We
> believe that the Orchard Friends School in
> Moorestown is appropriate for a number of reasons.
> This school has occupational therapy services 5 days
> per week.  They have an extensive program
> established for sensory integration, with a vast
> array of complex equipment.  All of their teaching,
> administrative, clinical and support staff members
> are already trained in their program for Central
> Auditory Processing Disorder. . . .
>
> I have enclosed a folder with information about the
> Orchard Friends school.  However, we are willing to
> consider any other appropriate out-of-district
> schools that the district proposes.

(A.R. at R-25)

> Shortly thereafter, on May 21, 2004, D.S. wrote to the CST

---

[9]  A copy of the IEP was sent to Plaintiffs by letter dated March 17,
2004.  (A.R. at R-23)

again, stating, among other things, that she expected
arrangements for M.S., Jr.'s placement at Orchard Friends School
to begin the next week.  (A.R. at R-26)

A week later, the CST met again to discuss a routine
reevaluation in anticipation of M.S., Jr. beginning kindergarten
in the fall of 2004.[10] (A.R. at R-27)  However, D.S. refused to
consent to the evaluation (A.R. at R-31; R-32) and did not give
her consent until July 27, 2004. (A.R. at P-19)

It appears that in July or August, 2004, a meeting was held
wherein Plaintiffs' lawyer and lawyers for the School Board
discussed placing M.S., Jr. at Orchard Friends School, although
the circumstances surrounding the meeting are not clear.[11]  (A.R.
at R-35)  In any event, no agreement was reached, as evidenced by
the letter D.S. sent to the Superintendent of the Mullica
Township School Board on August 16, 2004.  (Id.)  D.S. informed
the Superintendent that "[y]ou will receive a copy of our request
for [a] due process hearing from our attorney in the next several

---

[10]   Pursuant to New Jersey's IDEA implementing regulations, M.S., Jr.
would no longer be classified as "Preschool child with a disability" upon his
fifth birthday.  N.J.A.C. 6A:14-3.5(c)10.  Accordingly, the CST was required
to determine whether M.S., Jr. met the requirements for the new
classification.  See N.J.A.C. 6A:14-3.8(g) ("By June 30 of a student's last
year of eligibility for a program for preschoolers with disabilities, a
reevaluation shall be conducted and, if the student continues to be a student
with a disability, the student shall be classified according to N.J.A.C.
6A:14-3.5(c) or 3.6(a).")

[11]   The record does not indicate who called the meeting, where it was
held, or specifically who attended the meeting.  (A.R. at R-35)  There is also
some evidence in the record that the parties may have participated in
mediation during the summer of 2004.  (A.R. at P-18)

days.  We will be requesting for the school district to cover expenses for tuition, evaluations, and legal fees."  (Id.)

M.S., Jr. enrolled in the Orchard Friends School's full-day kindergarten program in September, 2004.  (A.R. at P-26).[12]  He received speech-language therapy and occupational therapy six times each per week. (Id.)  He continued to receive private occupational therapy as well.  (A.R. at P-48; Bliss Testimony Tr. 91:19-25)  In May of 2005, M.S., Jr. stopped attending Orchard Friends School due to non-payment of tuition. (A.R. at P-50)

In anticipation of M.S., Jr.'s return to Mullica Primary School for the 2005-2006 school year, the CST met on May 26, 2005, to reevaluate M.S., Jr.'s classification and create an IEP for his first grade placement.  (A.R. at R-37, 38)

On June 29, 2005, D.S. sent a letter to the CST enclosing independent evaluation reports resulting from evaluations of M.S., Jr. conducted at the Davis Center for Auditory Processing in March, 2005, and May, 2005.  (A.R. at R-40)  The letter stated,

> We have already given the district numerous other reports from private clinicians over the past several years which document [M.S., Jr.'s] weakness with auditory processing which resulted from his brain injury.
>
> Recommendations by Ms. Davis indicate that [M.S.,

---

[12]  Tuition for the 2004-2005 school year was $27,000 "for students who are being paid for by school districts" and $24,500 for "students being paid for by their parents." (A.R. at P-41)

> Jr.] needs . . . Bioacoustics, Auditory Integration
> Training, and Tomatis. . . .
>
> I am requesting that Mullica Township School
> District cover the expense of these programs which
> [M.S., Jr.] has shown he has such great need for.

(Id.)

The CST met on August 8, 2005, in order to incorporate the
information from the Davis Center evaluations into M.S., Jr.'s
IEP for the upcoming year.[13]  (A.R. at R-43)  The new IEP
incorporated the Davis Center's recommendations for speech-
language therapy, and provided that M.S., Jr. would receive
individualized speech-language therapy twice a week and a
classroom therapy session once a week, instead of individualized
therapy three times a week, as was provided in the May, 2005
IEP.[14]  (A.R. at R-43)

On the same day D.S. sent the Davis Center reports to the
CST, June 29, 2005, Plaintiffs filed a due process petition with
the Office of Special Education Programs of the New Jersey
Department of Education.  Plaintiffs' petition sought an order
directing Mullica Township's Board of Education to: (1) provide
M.S., Jr. with a free and appropriate public education; (2)

---

[13]  The August, 2005 meeting was ordered by the ALJ presiding over the
case pending before the Office of Special Education Programs.  (A.R. at R-41;
ALJ Opinion at 42)

[14]  The IEP provisions for occupational therapy remained unchanged.
M.S., Jr. would receive occupational therapy once a week for 30 minutes.
(A.R. at R-43)

15

reimburse Plaintiffs for tuition paid to Orchard Friends School;
(3) reimburse Plaintiffs for costs associated with private
occupational therapy; and (4) reimburse Plaintiffs for the
various occupational, speech-language, and audiological
evaluations of M.S., Jr.  The petition also sought a declaratory
ruling that Defendant's proposed IEP for the 2005-2006 school
year violated the IDEA but that issue is not raised in the
instant Complaint.

ALJ Lillard E. Law presided over the plenary hearing of the
case, which lasted nine days, and created over 1700 pages of
transcript.  After receiving post-hearing briefing from the
parties, ALJ Law issued his 150-page decision and order on
November 9, 2005.  In the conclusion section of the decision, he
stated,

> The record clearly demonstrates that [M.S., Jr.] is
> a handicapped child and eligible for a FAPE which
> includes appropriate related services under the
> provisions of IDEA.  The record also demonstrates
> that the Board has made every effort to provide
> [M.S., Jr.] with a FAPE.  Where the parent, Mrs.
> D.S., has resisted the efforts of the Board and its
> CST to provide [M.S., Jr.] with the education to
> which he is entitled, the Board has acceded to each
> and every one of the parent's demands.  While the
> mother of [M.S., Jr.] may want the "best" for her
> handicapped child, that is not what the law
> provides.  *See Board of Education v. Rowley*, 458
> U.S. 203-04 (1982).  The Board's CST has worked
> diligently to provide meaningful and personalized
> instruction with sufficient support services to
> permit [M.S., Jr.] to benefit educationally from
> that instruction.  *Rowley, supra*, at 203-04.  Mrs.
> D.S. on the other hand, has thwarted and obstructed
> the CST at every turn.  From the very beginning,

16

> before the first IEP was put into place, D.S.
> insisted that [M.S., Jr.] be enrolled in an out-of-
> district placement, at the Board's expense.  Even
> when the CST incorporates all of the recommendations
> of the independent evaluators contacted by the
> mother, D.S. insists that [M.S., Jr.] is to enroll
> in an out-of-district placement.  The mother has not
> provided the school district with the opportunity to
> provide [M.S., Jr.] with a meaningful FAPE,
> therefore there is no way of determining whether or
> not his IEP meets the requirements of IDEA.  Rather,
> Mrs. D.S. had taken it upon herself to unilaterally
> remove [M.S., Jr.] from the Board's school for the
> 2004-2005 school year, and enroll him in the Orchard
> Friends School, a private non-sectarian school
> (formerly sectarian, associated with the Quakers).
> Petitioner now seeks the Mullica Township Board to
> reimburse the parents for her unilateral placement
> of [M.S., Jr.] at the Orchard Friends School.

(Spar Cert., Ex. A (ALJ Decision and Order) at 149)  The ALJ then

held that Plaintiffs were not entitled to reimbursement of

tuition for Orchard Friends School, but that "the Board is

responsible for the costs of the time, preparation and execution

of the evaluations [of M.S., Jr.]" "to the extent the Board's CST

has incorporated the recommendations of certain independent

evaluators in M.S.'s IEP for the 2005-2006 school year."  (Id.)

The case was dismissed "in all other respects."  (Id.)

Plaintiffs then filed the present lawsuit.  Their Complaint

appeals the ALJ's decision denying them reimbursement for their

costs associated with Orchard Friends School (including tuition

and transportation) and reimbursement for transportation costs

and insurance co-pays associated with private occupational

therapy (Count 2).  The Complaint also seeks to enforce the ALJ's

17

order directing the School Board to reimburse Plaintiffs for the costs of certain independent evaluations (Count 3); and seeks attorneys fees and costs, including expert witness fees incurred at the due process hearing (Count 1).  Defendant filed a Counterclaim, appealing the ALJ's decision regarding the reimbursement of costs of the independent evaluators.  Plaintiff moves for summary judgment.  Defendant cross-moves for judgment on the administrative record.

## II.

"When deciding an IDEA case, the district court applies a modified *de novo* review and is required to give due weight to the factual findings of the ALJ."  *M.S. v. Ramsey Board of Education*, 435 F.3d 384, 389 (3d Cir. 2006).  The Court must "defer to the ALJ's factual findings unless it can point to contrary non-testimonial extrinsic evidence on the record."  *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003).  The Court's decision is based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(B)(iii).

"Because the IDEA requires a district court to grant a judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of 'no genuine issues of material fact.'"  *L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974

18

(10th Cir. 2004).  The parties in this case are effectively seeking "a judgment on the administrative agency's record."  *Id.* Although seeking judicial review of an administrative agency's decision by way of a summary judgment motion "is permissible under the IDEA, it is not a true summary judgment procedure. Instead, the district court essentially conduct[s] a bench trial based on a stipulated record."  *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993).[15]

## III.

### A.

Plaintiffs principally contend that Defendant failed to provide M.S., Jr. a "free and appropriate education" ("FAPE") thereby entitling them to reimbursement for their unilateral placement of M.S., Jr. in Orchard Friends School's kindergarten during the 2004-2005 school year.

The IDEA provides:

---

[15]  *See also M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002) ("when there is no new evidence presented to the district court, as in this case, 'the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'") (quoting *Heather S. by Kathy S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)); *cf. Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 385 n.4 (4th Cir. 2000) ("Several courts also indicate that the matter is before the court on cross-appeals or cross-motions for summary judgment despite the fact that there are clearly disputed issues of material fact.  As we conclude, IDEA actions are original civil actions that should typically be disposed of by motions for judgment."); *Doe v. Metropolitan Nashville Public Schools*, 133 F.3d 384, 387 n.2 (6th Cir. 1998)(acknowledging that when no additional evidence is taken, the district court may "decide the case based on the record" but explaining that such a decision should not be called summary judgment).

(C) Payment for education of children enrolled in private schools without the consent of or referral by the public agency

(i) In general
. . . this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services,[16] of a child with a disability at a private school or facility if that agency made a free and appropriate public education available to the child and the parents elected to place the child in such private school or facility.

(ii) Reimbursement for private school placement
If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free and appropriate education available to the child in a timely manner prior to that enrollment.

(iii) Limitation on reimbursement
The cost of reimbursement described in clause (ii) may be reduced or denied–

. . .

(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

20 U.S.C. § 1412(a)(10)(C)(i)-(iii); *see also* 34 C.F.R. §300.403 (same); N.J.A.C. 6A:14-2.10 (same).  Thus, when parents seek reimbursement for a unilateral private placement, the Court must first determine whether the school board provided the student a

---

[16] "Related services" include "speech-language pathology and audiology services" and "physical and occupational therapy." 20 U.S.C. § 1401(26).

FAPE by answering the question, "is the individualized educational program developed through the [IDEA's] procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley,* 458 U.S. at 206-07.

FAPE is an education that is "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Rowley*, 458 U.S. at 188-89.[17] "The education provided must be sufficient to confer some educational benefit upon the handicapped child, although the state is not required to maximize the potential of handicapped children." *Ramsey Bd. of Ed.*, 435 F.3d at 390 (internal quotations omitted). The benefit conferred must be "meaningful," not merely "more than trivial." *Id.* Plaintiffs bear the burden of demonstrating that M.S, Jr.'s IEP did not provide him a FAPE. *Schaffer v. Weast*, 546 U.S. 49, 126 (2005); *Ramsey Bd. of Ed.*, 435 F.3d at 391.

1.   <u>2004-2005 IEP</u>

In this case the CST did not create an IEP for the 2004-2005 school year. As the ALJ found, and the preponderance of the

---

[17] *See also* 20 U.S.C. § 1401(9) ("The term 'free and appropriate public education' means special education and related services that— (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title."); 34 C.F.R. § 300.13 (same).

evidence proves, D.S. decided to enroll M.S., Jr. in Orchard
Friends School before the 2004-2005 IEP was ever completed.  D.S.
informed the CST in her May 13, 2004 letter that she had
concluded that the school board had failed to provide M.S., Jr.
FAPE and that an out-of-district private placement was
necessary.[18]  When the CST met on May 28, 2004, to reevaluate
M.S., Jr.'s eligibility for special education and related
services as a kindergartner, D.S. did not sign the consent to
have M.S., Jr. evaluated, which was a necessary prerequisite
to creating M.S., Jr.'s 2004-2005 IEP.  *See* N.J.A.C. 6A:14-
3.7(j)2; (A.R. at R-27; "These reevaluations are necessary to
determine a new classification and program for [M.S., Jr.] for
the 2004-2005 school year.")  Indeed, D.S. withheld her consent
to evaluate until July 27, 2004.[19]  On that same day, D.S.
notified the school board that M.S., Jr. had been offered
enrollment at Orchard Friends School and, through her attorney,
gave the school's attorneys an enrollment contract and an outline
of the services provided at Orchard Friends School.  (A.R. at R-
35)

Based on this evidence, the ALJ reasoned, "[D.S.] has not
provided the school district with the opportunity to provide

---

[18]  Again on May 21, 2004, D.S. wrote to the CST informing them that
arrangements with Orchard Friends School would begin in the next week.

[19]  Parental consent is required before an evaluation may be conducted.
20 U.S.C. § 1414(c)(3); N.J.A.C. 6A:14-2.3(a)3; 6A:14-3.8(c).

[M.S., Jr.] with a meaningful FAPE, therefore there is no way of determining whether or not his IEP meets the requirements of IDEA.  Rather, Mrs. D.S. had taken it upon herself to unilaterally remove [M.S., Jr.] from the Board's school for the 2004-2005 school year, and enroll him in the Orchard Friends School."  (ALJ Opinion at 149)

The preponderance of the evidence supports the ALJ's findings that D.S. refused to cooperate with the CST to such an extent that the CST was unreasonably prevented from creating an IEP for the 2004-2005 school year.  New Jersey's administrative regulations require that the CST reevaluate every preschool student who will enter kindergarten in the coming school year.  N.J.A.C. 6A:14-3.8(g).  The prescribed reevaluation must be performed by June 30 preceding the kindergarten year.  Id.[20]  D.S. and the other members of the CST discussed reevaluation at the May 28, 2004 meeting, and D.S. was informed that the CST required her consent by "the middle of the week of May 31, 2004" in order to have the reevaluation completed in time. (A.R. R-31-32)  Yet D.S. refused to provide consent to reevaluate M.S., Jr. until July 27, 2004-- well after the June 30 deadline prescribed by the regulations.

These facts support the conclusion that Plaintiffs acted

---

[20]  The regulations also require that preschool students' IEPs be reviewed by June 30.  N.J.A.C. 6A:14-3.7(i)1.  That IEP review must include a review of "the results of any reevaluation conducted according to N.J.A.C. 6A;14-3.8."  N.J.A.C. 6A:14-3.7(j)2.

23

unreasonably, and reimbursement may be denied pursuant to 20
U.S.C. § 1412(a)(10)(C)(iii)(III).[21]   Plaintiffs should not be
reimbursed for private special education and related services
provided to M.S, Jr. during the 2004-2005 school year when they
failed to cooperate with the Mullica Township CST in developing
an appropriate IEP for that very school year.   *See generally,*
*M.T.V. v. Dekalb County Sch. Dist.*, 446 F.3d 1153, 1160 (11th
Cir. 2006) ("Every court to consider the IDEA's reevaluation
requirements has concluded if a student's parents want him to
receive special education under IDEA, they must allow the school
itself to reevaluate the student and they cannot force the school
to rely solely on an independent evaluation.").   Nothing in the
record indicates that any reevaluation conducted on behalf of the
School Board would in any way harm M.S., Jr.   Nor does anything
in the record indicate that Plaintiffs were concerned that any
harm would result.[22]

_____

[21]   Notably, § 1412(a)(10)(C)(iii)(II) provides that reimbursement may
be reduced or denied "if, prior to the parents' removal of the child from the
public school, the public agency informed the parents, through the notice
requirements described in section 1415(b)(7) of this title, of its intent to
evaluate the child (including a statement of purpose of the evaluation that
was appropriate and reasonable), but the parents did not make the child
available for such evaluation."   This provision could also support the denial
of reimbursement but for the fact that Plaintiffs did finally make M.S., Jr.
available for evaluation by Ms. Vetter on July 28, 2004, before M.S., Jr.
began attending Orchard Friends School.   *Cf.* 3 Americans with Disabilities:
Practice and Compliance Manual § 11:130 (Aug. 2003) ("'Removal,' for purposes
of prior notice requirements of Individuals With Disabilities Education Act
(IDEA), [20 U.S.C. § 1412(a)(10)(C)(iii)] refers to the actual physical
removal of the child from public school.").

[22]   *Cf. P.S. v. Brookfield Bd. of Ed.*, 353 F. Supp. 2d 306, 314-15 (D.
Conn. 2005)(finding that the preponderance of the evidence supported ALJ's
determination that parents unjustifiably refused to allow Board's psychologist

This conclusion alone would be sufficient to sustain the ALJ's decision and grant judgment to Defendant with respect to Plaintiffs' claim for tuition reimbursement and transportation costs.  However, even absent D.S.'s unreasonable actions, the preponderance of the evidence does not support Plaintiffs' contention that the IEP in place at the time D.S. made the decision to enroll M.S., Jr. in Orchard Friends School-- the March 12, 2004 IEP ("March 2004 IEP")-- failed to provide M.S., Jr. a FAPE.

2.   <u>March 2004 IEP</u>

The bulk of Plaintiffs' arguments with respect to the alleged inadequacies of the March 2004 IEP rest on the premise that the IEP, which covered M.S., Jr.'s last year of pre-school (i.e. the 2003-2004 school year) was intended to cover his kindergarten year as well.  Nothing in the administrative record supports that premise.  Indeed, all the record evidence demonstrates that the IEP Team intended to create a new IEP for the 2004-2005 school year based on the July 2004 reevaluation results.  Thus, Plaintiffs assertion that M.S., Jr.'s March 2004 IEP failed to provide him a FAPE during his kindergarten year, is

---

to evaluate disabled student where record established that the evaluation was relevant to the student's proper identification, nothing in the record demonstrated that the proposed evaluator was not qualified to perform the evaluation, and there was no evidence that the evaluation would harm the student).

nonsensical because the March 2004 IEP-- his preschool IEP-- did not (and could not, according to New Jersey regulations) govern the 2004-2005 school year, his kindergarten year.[23]

Plaintiffs, however, also assert that the March 2004 IEP was inadequate with respect to occupational therapy services.  They assert both substantive and procedural challenges.[24]

Plaintiffs assert two procedural irregularities.  First, they contend that the they were never provided periodic progress statements as required by 20 U.S.C. § 1414(d)(1)(A)(viii)(II).[25] Second, they contend that the School Board failed to fully

---

[23] Plaintiffs' argument that the March 2004 IEP did not incorporate several reports and recommendations from independent evaluators fails for similar reasons.  As Plaintiffs state in their brief, the reports at issue were created and provided to the CST "after the March 12, 2004 IEP was prepared but before September 2004 when the new school year began."  (Pl. Opening Br. at p. 31) Logically, the reports could not have been included in the March 2004 IEP when it was initially drafted because they did not yet exist.  To the extent Plaintiffs argue that Defendants had a duty to subsequently revise the March 2004 IEP to incorporate the independent evaluation results, Plaintiffs have not adduced sufficient evidence to demonstrate that Defendant breached that duty.  The CST was still in the process of reevaluating M.S., Jr. in May, 2004, when it asked D.S. for consent to do its own evaluations so that the March 2004 IEP could be revised.  When D.S. withheld her consent, she stalled that process until she consented in July, 2004, and then enrolled M.S., Jr. in Orchard Friends School shortly thereafter.

[24] In addition to asserting that the inadequate occupational therapy justifies their unilateral placement of M.S., Jr. in Orchard Friends School, Plaintiffs also contend that the failure to provide adequate occupational therapy entitles them to reimbursement for co-pays and transportation costs associated with private occupational therapy.  Accordingly, the Court simultaneously addresses both arguments in its analysis.

[25] The subsection states that IEP must include "a statement of how the child's parents will be regularly informed (by such means as periodic report cards), at least as often as parents are informed of their non-disabled children's progress."  § 1414(d)(1)(A)(viii)(II).  Amendments to § 1414(d) in 2004 have eliminated this particular subpart but the effective date of the amendments is July 1, 2005.  As Plaintiffs' claims involve alleged deficiencies occurring before the effective date of the amendments, the amendments do not apply.

implement M.S., Jr.'s 2002 and 2003 IEPs because the IEPs called for standardized testing but no testing was done.

"Only those procedural violations of the IDEA which result in loss of educational opportunity or seriously deprive parents of their participation rights are actionable." *C.M. v. Bd. of Ed.*, 128 F. App'x 876, 881 (3d Cir. 2005).[26]  With respect to the absence of periodic progress statements, nothing in the record supports the conclusion that Plaintiffs were uninformed about their son's progress, thereby depriving them of their participation rights.  On the contrary, the record is replete with written communications from D.S. to the CST regarding her concerns for M.S., Jr., and D.S. attended all of the IEP and reevaluation meetings.  Indeed, the first reevaluation meeting in October, 2003, was convened in response to D.S.'s concerns about M.S., Jr.'s occupational therapy.  *See C.M.,* 128 F. App'x at 881-82 (parents were not deprived of participation rights when the record demonstrated that parents actively participated in the development of their child's IEP and exerted "extensive influence over every step of [their child's] education.").

With respect to standardized testing, neither the 2002 IEP nor the 2003 IEP provided for standardized testing in the area of

---

[26]  *Cf.* N.J.A.C. 6A:14-2.7(k) ("In matters alleging a procedural violation, an administrative law judge may decide that a child did not receive a FAPE ony if the procedural inadequacies: 1. Impeded the child's right to a FAPE; 2. Significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or 3. Caused a deprivation of educational benefits.").

occupational therapy.[27]   (A.R. at R-2, p. 3; R-4, p. 5)
Therefore, failure to test could not be a procedural violation of
the IEPs because the IEPs did not provide for testing.[28]

    Moreover, to the extent Plaintiffs argue that occupational
therapy standardized tests should have been administered even
though the IEPs did not call for such testing, Plaintiffs have
not carried their burden of proving that the absence of such
testing resulted in a loss of educational opportunity.

    Plaintiffs' argument is premised on the alleged fact that
M.S., Jr. failed to progress while in Mullica Township's program.
They reason that standardized testing would have revealed his
failure to progress.  However, the preponderance of the evidence
does not support Plaintiffs' assertions that M.S., Jr. failed to
progress.  Absent proof that M.S., Jr. failed to progress with
the occupational therapy services Defendant provided to him,
Plaintiffs have not established a loss of educational opportunity
nor failure to provide a FAPE.  *Cf. Board of Education v. Diamond
ex rel. Diamond*, 808 F.2d 987, 991 (3d Cir. 1986)("[T]he Act
requires a plan of instruction under which educational progress
is likely.").

_____

    [27]  The IEPs did provide for standardized testing of speech-language
skills but Plaintiffs do not assert in this Court that M.S., Jr. received
inadequate speech-language services.

    [28]  Plaintiffs do not cite, nor has the Court found, any provision of
the IDEA or corresponding regulations that require standardized testing of
students.

Defendant continuously provided occupational therapy services to M.S., Jr. from 2002, when he started the preschool program, until D.S. requested that occupational therapy services be stopped in October, 2003.  Plaintiffs contend that M.S., Jr. made no progress during that entire time frame.  However, they have failed to adduce sufficient evidence to support their contention.

Plaintiffs rely on the reports and testimony of Occupational Therapist Leigh Ann Bliss and Psychologist Linda Ann Petti to establish that M.S., Jr. failed to progress while receiving occupational therapy from Defendant.

Ms. Bliss' report and testimony together establish that she first met and evaluated M.S., Jr. on September 26, 2003.  (A.R. at P-6; Bliss Testimony Tr. at 16:11-17:18)  Based on that one-time evaluation, she concluded that M.S., Jr. had "moderate to severe" impairment in fine motor skills and sensory processing, and "moderate" impairment in postural mechanisms and visual perception.  (A.R. at P-6)  In particular, standardized testing showed that his fine motor quotient ranked in the 5th percentile due to his "very poor" grasping skills.[29]  (Id.)  Ms. Bliss recommended occupational therapy once a week for 60 minutes.

_____

[29]  The "fine motor quotient" consists of two factors: "grasping" and "visual motor" skills.  (A.R. at P-6) M.S., Jr.'s test results for visual motor skills were within average range (37th percentile) but his very low grasping skills rank (1st percentile) affected the overall quotient to such an extent that the entire quotient ranked in the 5th percentile.  (Id.)

(Id.)

Notably, Ms. Bliss never observed M.S., Jr. in occupational
therapy provided by Defendant.  Nor could she state at the due
process hearing whether she had reviewed any of M.S., Jr.'s
records from Mullica Township before her evaluation and report.
(Bliss Testimony Tr. at 100:8-16)  Moreover, at no time during
her testimony did Ms. Bliss opine whether the occupational
therapy provided by Defendant was adequate.

Dr. Petti, a psychologist, not an occupational therapist,
met and evaluated M.S., Jr. for the first time on September 1,
2004-- almost one full year after M.S., Jr. stopped receiving
occupational therapy from Defendant.  (A.R. at P-21; Petti
Testimony Tr. at 45:4-17)  She never observed M.S., Jr. at
Mullica Township Elementary School because he was attending
classes at Orchard Friends School at the time.  (Petti Testimony
Tr. at 56:14-57:8)  Instead, she observed a regular kindergarten
class at Mullica Township Elementary School as well as M.S.,
Jr.'s class at Orchard Friends School.  (A.R. at P-21)  Based on
Dr. Petti's classroom observations, she concluded that "the
public school program at the Mullica Township Elementary School
cannot adequately accommodate and address [M.S., Jr.'s] needs."
(Id.)  Nothing in her report opined on occupational therapy
services.

At the due process hearing, Dr. Petti testified that based

30

on her review of M.S., Jr.'s records and her own evaluations and observations, her opinion was that M.S., Jr. "had not made meaningful progress" in occupational therapy at Mullica Township's school since he began therapy in February, 2002, until he stopped receiving occupational therapy (upon his mother's request) in October, 2003.  (Petti Testimony Tr. at 56:1-57:24)

Taken together, this evidence fails to establish by a preponderance of the evidence that M.S., Jr. failed to progress while receiving occupational therapy services from Defendant or that the services rendered were inadequate.  First, neither Ms. Bliss, nor Ms. Petti, ever observed M.S., Jr.'s occupational therapy sessions at Mullica Township's school.[30]  Second, Plaintiffs have not adduced evidence to establish a benchmark from which to measure M.S., Jr.'s progress.  Ms. Bliss' report establishes that in September, 2003, M.S., Jr. was performing poorly in certain areas, especially fine motor grasping, but there is no evidence in the record establishing with any particularity the extent of M.S., Jr.'s motor skills before Ms. Bliss' evaluation.[31]  Without evidence that M.S., Jr.'s skills

---

[30]  At some point D.S. described to Ms. Bliss certain brushing techniques that were used during M.S., Jr.'s occupational therapy at Mullica Township School.  Based on D.S.'s description, Ms. Bliss opined that the technique was being performed improperly, but Ms. Bliss testified that her opinion was based on D.S.'s description only.  (Bliss Testimony Tr. at 71:21-74:15)

[31]  Dr. Petti's report was based on an evaluation conducted in September, 2004, and various other independent evaluations performed on M.S., Jr. during 2004.  However, M.S.,Jr. stopped receiving occupational therapy services from Defendant in October, 2003.  Thus, Dr. Petti's report does

were the same or better sometime before Ms. Bliss' evaluation and report,[32] there is insufficient evidence from which the Court might conclude by a preponderance of the evidence that the occupational therapy provided by Defendant was inadequate.

On the other hand, Defendant presented evidence that by October, 2003, M.S., Jr. had "an inconsistent but improved grip with his right hand," as observed by his occupational therapist, Ms. Grob, at Mullica Township's school.  (A.R. at R-5) Additionally, M.S., Jr.'s March 2004 IEP reported:

> In regards to [M.S., Jr.'s] previous IEP goals for occupational therapy [established in February, 2003], [M.S., Jr.] has met the following:
>
> 1. [He] will establish hand dominance 100% of the time.  *He has met this [goal] with 100% accuracy for drawing/writing and 50% accuracy for other activities.*
>
> 2. [He] will use tripod grasp to copy age appropriate designs a. with adaptations with 80% accuracy b. without adaptations with 60% accuracy. *This skill is emerging for 2a., not accomplished and not attempted due to [D.S.] requesting that Occupational Therapy Services in the school be discontinued as of October 24, 2003.  Because of [D.S.'s] request, [M.S.] has only received six sessions since September 2003.*
>
> 3.  As evidence of improved sensory processing [he] will screen relevant from irrelevant information for 5-7 minutes. *This goal has been accomplished with 80% accuracy.*

---

nothing to establish any progress or lack of progress from February, 2002, to October, 2003.

[32]  The bulk of Ms. Bliss' testimony focused on the M.S., Jr.'s performance after he stopped receiving occupational therapy from Defendant.

4.  As evidence of improved motor planning [he] will copy age appropriate block designs 3 out of 4 times. *This goal was accomplished at the time of retesting.*

5.  As evidence of improved tactile-proprioceptive awareness, [he] will use appropriate force when engaged in a variety of activities 75% of the time. *[He] is demonstrating continuing improvement with unfamiliar tasks, although 75% accuracy is not accomplished at this time.  He has accomplished 75% accuracy with familiar activities.*

(A.R. at R-21)(italics added for clarity).   Thus, the preponderance of the evidence does not support the finding that M.S., Jr. failed to progress or that the occupational therapy services provided by Defendant were not reasonably calculated to confer a meaningful educational benefit on M.S., Jr.  The undisputed fact that M.S., Jr. was sufficiently skilled to enter kindergarten at five years old further militates against such a finding.  *See Rowley*, 458 U.S. at 203 n.25, 209-10 (noting that advancing from grade to grade is not always dispositive of whether a child is receiving FAPE, but acknowledging the relevance of such evidence).

Plaintiffs are not entitled to reimbursement for tuition and related costs associated with M.S., Jr.'s attendance at Orchard Friends School.  Likewise they are not entitled to reimbursement for private occupational therapy co-pays and transportation costs.  Judgment will be granted to Defendant on Count 2 of the Complaint.

**B.**

Despite the ALJ's determination that Plaintiffs acted unreasonably with respect to the development of the 2004-2005 IEP, he ordered that "to the extent the Board's CST has incorporated the recommendations of certain of the independent evaluators in M.S.'s IEP for the 2005-2006 school year, the Board is responsible for the costs of the time, preparation and execution of the evaluations."[33]   (ALJ's Opinion at p. 149)   The ALJ did not explain his reasoning for the decision.

Plaintiffs seek to enforce the ALJ's order.[34]   Defendant asserts that the ALJ's decision on this issue should be reversed, but makes no argument as to why the decision was erroneous.

The Code of Federal Regulations provides:

§ 300.502 Independent educational evaluation.

(a) General. (1) The parents of a child with a disability have the right under this part to obtain an independent educational evaluation of the child, subject to paragraphs (b) through (e) of this section.

(2) Each public agency must provide to parents, upon request for an independent educational evaluation, information about where an independent educational evaluation may be obtained, and the agency criteria

---

[33]   The 2005-2006 IEP incorporated the recommendations of four independent evaluators: Dr. Petti, Audiologists Carol Gelb and Dorrine Davis of the Davis Center, and Elise Ciner, who tested M.S., Jr.'s vision.  (A.R. at P-43)  The evaluations occurred on September 1, 2004 (Dr. Petti– A.R. at P-21); March 23-24, 2005 (Gelb and Davis– A.R. at P-22); May 12, 2005 (Davis–A.R. at P-23); and April 12, and May 24, 2005 (Ciner– A.R. at P-25).

[34]   Plaintiffs only seek enforcement as to three of the four evaluations, as their insurance company paid for Ms. Ciner's evaluation. (Pls' Opening Br. at 40-41)

applicable for independent educational evaluations
as set forth in paragraph (e) of this section.

(3) For the purposes of this subpart--

        (i) Independent educational evaluation means an
evaluation conducted by a qualified examiner who is
not employed by the public agency responsible for
the education of the child in question; and

        (ii) Public expense means that the public
agency either pays for the full cost of the
evaluation or ensures that the evaluation is
otherwise provided at no cost to the parent,
consistent with § 300.103.

(b) Parent right to evaluation at public expense.

(1) A parent has the right to an independent
educational evaluation at public expense if the
parent disagrees with an evaluation obtained by the
public agency, subject to the conditions in
paragraphs (b)(2) through (4) of this section.

34 C.F.R. § 300.502;[35] *cf.* N.J.A.C. 1:6A-14.4(a) (ALJ "may order

an independent educational evaluation of the pupil. . . . The

[ALJ] shall order the board of education or public agency to pay

for the independent educational evaluation at no cost to the

parent(s) or guardian.").

The issue is whether Plaintiffs are entitled to

reimbursement, after they have moved out of the district, for

independent educational evaluations unilaterally obtained outside

---

[35]   In August, 2006, § 300.502 was amended but those amendments took
effect in October, 2006, and do not apply to this case.  It is worth noting,
however, that the amendments added a new subsection (b)(5) which states, "[a]
parent is entitled to only one independent educational evaluation at public
expense each time the public agency conducts an evaluation with which the
parent disagrees."

the collaborative IEP development process.  Notably, the issue
before the ALJ was somewhat different.  At the due process
hearing, the parties and the ALJ proceeded on the assumption that
M.S., Jr. would attend Mullica Township's school in 2005-2006.
Indeed, Plaintiffs' due process petition sought a ruling that the
School Board's proposed IEP for 2005-2006 was inadequate.
However, Plaintiffs plead in their Complaint filed in this Court
that they "moved out of the Mullica Township School District" "in
fall 2005."  (Compl. at ¶ 16)[36]

The Court concludes that Plaintiffs are not entitled to
reimbursement.  The three evaluations at issue were all performed
after M.S., Jr.'s unilateral removal from Mullica Township's
School and while he was attending Orchard Friends School.  The
record demonstrates that the evaluations were not obtained by
Plaintiffs in consultation with the School District or with the
intention that M.S., Jr. would return to the district.  The
evaluations were sought for the purpose of providing additional
evidence that Defendant's services were inadequate, thereby
supporting Plaintiffs' contention that an alternative private
placement at public expense was necessary.

Plaintiffs provided the Davis Center reports to Defendant on
the same day they filed their due process petition, which sought

---

[36]  Defendant admits the allegation in its Answer.  Nothing in the
administrative record indicates that the ALJ knew about the move or
Plaintiffs' intention to move.  Indeed, the Court cannot ascertain on this
record whether the move occurred before or after the ALJ issued his order.

a declaration that the proposed 2005-2006 IEP was inadequate.
Apparently recognizing that the School Board had no opportunity
to review the reports or discuss them with Plaintiffs, much less
incorporate them into the proposed IEP, the ALJ ordered the
parties to attend an IEP conference.  Specifically, the ALJ wrote
in his opinion,

> Ms. Vetter [the CST Chairperson] testified,
> credibly, that she was never informed of the three
> reports in the mother's letter of June 29, 2005,
> despite the fact that Vetter had requested all
> information in the mother's possession in order to
> determine an appropriate IEP for M.S.  Ms. Vetter
> testified that D.S. asserted to Vetter that she had
> no information.  Ms. Vetter contended that the
> mother had never produced an invoice for the three
> evaluations.

(ALJ Opinion at 42)

At the IEP conference, the CST considered the evaluations
and incorporated some of the recommendations into a revised IEP.
Despite the CST's revisions, however, Plaintiffs continued to
reject the proposed IEP, informing Defendant exactly two weeks
after the conference that they intended to place M.S., Jr. in
Atlantic Prep Academy for the 2005-2006 school year.  (Pls'
Answer to Counterclaim at ¶ 26)  Thereafter, they moved out of
the district altogether.

The IDEA provides that IEPs will be developed through
cooperation and collaboration between teachers, special education
professionals, and parents.  *See School Committee of the Town of*

37

*Burlington v. Department of Education*, 471 U.S. 359, 368 (1985). Similarly, the governing regulation contemplates that parents are entitled to reimbursement for independent evaluations when they are collaborating with the local educational agency in developing an appropriate IEP, based on the district's own evaluations and any independent evaluations.

Section 300.503(b)(2)(ii) contemplates that when a parent disagrees with a district's evaluation, the parent will first request an independent evaluation from the district, which is then responsible for ensuring that the evaluation is provided at public expense. *See also,* § 300.503(c)(1) (public agency must consider results of parent-initiated independent evaluation when making decisions concerning FAPE). Here, however, Plaintiffs unilaterally sought independent evaluations outside the collaborative IEP process. They only sought reimbursement after the fact, and continued to seek reimbursement at the due process hearing after rejecting the IEP that incorporated recommendations of those evaluations.

Moreover, § 300.502 clearly assumes that the disabled child is living within the district from which reimbursement is sought. *See* § 300.502 (a)(3)(i) ("Independent educational evaluation means an evaluation conducted by a qualified examiner who is not employed by *the public agency responsible for the education of the child in question.*")(emphasis added); § 300.502 (c)(1)("If

38

the parent obtains an independent educational evaluation at private expense, the results of the evaluation-- [m]ust be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child.").  Plaintiffs moved out of the district before M.S., Jr. ever attended Mullica Township classes during the 2005-2006 school year.  The year before, he had attended Orchard Friends School.  Defendants had not been "the public agency responsible for the education of the child in question" since September, 2004,[37] and never again became responsible for M.S., Jr.'s education because he moved out of the district before re-enrolling.

For the above-stated reasons, the Court holds Plaintiffs are not legally entitled to reimbursement for the independent evaluations.  Accordingly, Defendant is entitled to judgment as a matter of law on Count 3 of the Complaint and its Counterclaim.


## C.

In IDEA cases, "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to a prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1415(i)(3)(B)(i)(I).  Plaintiffs have not prevailed on any of

---

[37] *See supra,* Section III. A. 2.  Defendant ceased being the public agency responsible for M.S., Jr.'s education after Plaintiffs' unjustified unilateral removal of M.S., Jr.  20 U.S.C. § 1412(a)(10)(C)(i).

their asserted claims.  Accordingly, an award of attorneys fees
is unwarranted and judgment will be granted to Defendant on Count
1 of the Complaint.

## IV.

For the foregoing reasons, Plaintiffs' Motion for Summary
Judgment will be denied and Defendant's Motion for Judgment on
the Administrative Record will be granted.  The Court will issue
an appropriate order.


Date: April 12, 2007

                          ___s/ Joseph E. Irenas_____

                          JOSEPH E. IRENAS, S.U.S.D.J.